# Exhibit A

07 CIV 9551

.IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

KATHLEEN BALDANZI AND GERALD P.
LONG,                                          CLASS ACTION COMPLAINT

On Behalf of Themselves and All Others
Similarly Situated,                            07-CV-_____

                          Plaintiffs,

                                               JURY TRIAL DEMANDED
    v.                                             OCT 25 2007

WFC HOLDINGS CORPORATION d/b/a                 U.S.D.C. S.D. N.Y.
WELLS FARGO BANK, N.A.,                             CASHIERS

                          Defendant.

-----------------------------------------------------------x

        Plaintiffs Kathleen Baldanzi and Gerald P. Long ("Plaintiffs" or "Baldanzi and

Long"), by their attorneys, Sanford Wittels & Heisler, LLP, in their individual capacities

and on behalf of a class of persons defined below, bring this class action and allege

upon knowledge as to their own acts and otherwise upon information and belief as

follows.

## OVERVIEW OF DEFENDANT WELLS FARGO'S
## WRONGFUL ACTS AND BASIS OF THIS ACTION

        1.      Plaintiffs bring this class action on behalf of themselves and a class of co-

op borrowers to recover unlawful interest charges that Defendant WFC Holdings

Corporation d/b/a Wells Fargo Bank, N.A. imposes and collects from borrowers who

pay off or refinance their co-op loans.  (Hereafter, unless the context requires

otherwise, Defendant WFC Holdings Corporation d/b/a Wells Fargo Bank, N.A. is

referred to as "Defendant," "Wells Fargo," "Company," or "Bank").

2.    In breach of the borrowers' co-op notes (hereafter "Note," "Loan Agreement" or "Loan Contract"), the Defendant Bank assesses Plaintiffs and the class of co-op borrowers one or more days of extra interest. The Note, however, requires that the borrower pay interest *only* until the principal balance is paid off – which is the date the co-op closing occurs and the loan terminates.

3.    Plaintiffs sue both individually and on behalf of all borrowers in New York State and nationwide who obtained and then paid off or refinanced co-op loans originated or held by Defendant Wells Fargo (the "Class"). The loans cover cooperative apartments located in the State of New York and all other states where Wells Fargo has co-op loans, and the Class period encompasses all co-op loan terminations which occurred during the period from six years before the date of filing of the action to the present.

4.    Plaintiffs Kathleen Baldanzi and Gerald P. Long's New York co-op loan with Wells Fargo ended on September 28, 2006, yet the Bank breached the Loan Agreement by charging Plaintiffs interest for four extra days through October 2, 2006. This amounts to an overcharge of approximately $200. In precisely the same way, Wells Fargo victimizes the Class of co-op borrowers on a mass scale by exacting the payment of extra-contractual, post-closing interest charges not permitted by its Loan Contracts.

5.    If a borrower does not pay the Bank's extra interest charge, Wells Fargo will not close the loan. Defendant Wells Fargo does not release to the borrower the co-op shares and proprietary lease – which evidence the borrower's ownership interest in

2

the co-op – unless it receives the extra interest wrongfully demanded. Unless the borrower pays the extra interest, Wells Fargo will retain its lien on the co-op shares and the borrower will be unable to sell or refinance his or her co-op.

6.     By exacting interest not permitted in the Bank's Loan Contracts, Wells Fargo breaches its Loan Agreements in New York and nationwide, violates the New York consumer protection statute (General Business Law Section 349(a)) and the other relevant consumer protection statutes, and unjustly enriches itself. Wells Fargo breaches its Loan Contracts with the Class of borrowers and engages in a deceptive business practices that enable it to obtain payments from customers attempting to terminate their relationship with the Company.

7.     Plaintiffs and the Class therefore sue to recover damages for themselves and a Class of thousands of co-op loan borrowers in New York and nationwide who have suffered damages as a result of Wells Fargo's wrongful and deceptive practice of charging interest on co-op loans beyond the end date of the loans. Plaintiffs allege causes of action for breach of contract, unjust enrichment and violation of General Business Law § 349(a) and the relevant comparable consumer protection statutes of the other states in which Wells Fargo has co-op loans.

8.     Wells Fargo must be ordered to rectify the injustice to its customers, the Class of borrowers, on whose behalf Plaintiffs sue here. Only a class action will provide the Class with any possibility of relief against the Company.

## JURISDICTION AND VENUE

9.     This Court possesses federal subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005

(109 P.L. 2; 119 Stat. 4; effective February 18, 2005) for the following reasons:

    a. the members of the proposed plaintiff Class number 100 or more;

    b. there is diversity of citizenship between *any one* member of the plaintiff Class (named and unnamed) and the Defendant; Plaintiffs Baldanzi and Long were the owners of property in New York and many class members are New York residents, while Defendant Wells Fargo is a Delaware corporation with its principal offices in California;

    c. the amount in controversy – which may be calculated by aggregating the claims of the proposed Class members – exceeds $5 million.

10.    Defendant is subject to personal jurisdiction in New York State. This lawsuit arises from Wells Fargo's wrongful conduct in New York State. Wells Fargo conducts business within the state sufficient to be considered present in New York.

11.    Venue is properly placed in this district pursuant to 28 U.S.C. § 1391(a)(1) and (2). A substantial part of the events and the omissions giving rise to Plaintiffs' claims occurred in this district and a substantial part of the property that is the subject of the action is situated in this district. Additionally, Wells Fargo is deemed to reside in this district because it is subject to personal jurisdiction in the district.

## THE PARTIES

12.    At all times relevant to this action, Plaintiffs Kathleen Baldanzi and Gerald P. Long were the owners of a co-op apartment unit located in New York, New York. From November 28, 2005 until September 28, 2006, Plaintiffs were the consumer borrowers on a co-op loan from Defendant Wells Fargo for shares in a cooperative apartment located at 66 Madison Avenue, Unit #9L, New York, New York 10016.

13.    Upon information and belief, Defendant Wells Fargo is a financial services company. Its principal business is providing financial services consisting of co-op loans, consumer banking, investment banking, commercial banking and

4

consumer finance to consumers and businesses. Wells Fargo makes, buys, sells and services residential, consumer and commercial loans.

14.    Upon information and belief, Wells Fargo is incorporated in the state of Delaware with its principal place of business in California and substantial offices in New York.

**FACTUAL ALLEGATIONS**

A.    **Plaintiffs' Co-op Loan From Wells Fargo Bank**

15.    Plaintiffs applied for a co-op loan with Wells Fargo in order to purchase their cooperative apartment located at 66 Madison Avenue, Unit #9L, New York, New York 10016.

16.    On or about November 28, 2005, Wells Fargo prepared and issued Kathleen Baldanzi and Gerald P. Long an "Adjustable Rate Note" (the "Note"). On information and belief, this document was drafted and sent by Defendant Wells Fargo from its New York City office.

17.    The Note states that Wells Fargo would lend Ms. Baldanzi and Mr. Long a co-op loan in the amount of $291,520.00, at an initial adjustable annual interest rate of 6.375%. The Note further required monthly payments of $1,548.70.

18.    The Note specifically provides that "interest will be charged [only] on unpaid principal." (Note, ¶2)

19.    The Note states that Plaintiffs need only make payments in the amount of $1,548.70 every month "until [they have] paid all of the principal and interest and any other charges . . . that [they] may owe under this Note." (¶3)

20.    The Note did not disclose that when Ms. Baldanzi and Mr. Long fully paid off the loan's principal, they would be forced to pay interest beyond the date they terminated their loan, and, unless they paid these deceptive charges, they would be unable to sell their co-op.

21.    In consideration for the co-op loan, Ms. Baldanzi and Mr. Long granted Wells Fargo a security interest in the shares of capital stock and proprietary lease for their co-op property, under which they would deposit with Wells Fargo the shares and lease as set forth in the Loan Security Agreement.

22.    On or about November 28, 2005, Plaintiffs also entered into a Loan Security Agreement with Defendant Wells Fargo, whereby Ms. Baldanzi and Mr. Long pledged to Wells Fargo the Lease for their co-op apartment at 66 Madison Avenue, Unit #9L, New York, New York 10016.  That same day, Plaintiffs pledged their 117 shares of stock in the co-op to Wells Fargo.

### B.    The Pay-Off Of The Co-op Loan & The Extra-Contractual Interest Charges

23.    On or before September 22, 2006, Plaintiffs advised Wells Fargo of their intent to sell to a buyer their shares of the co-op at 66 Madison Avenue, Unit #9L, New York, New York 10016.

24.    On September 22, 2006, Defendant Wells Fargo issued a Payoff Statement to Plaintiffs.  This Payoff Statement provided that, as of the closing, Ms. Baldanzi and Mr. Long would owe $291,520.00 in principal, along with $1,599.62 in interest to the Bank, bringing the total amount due in order to terminate their co-op loan to $293,119.62.

25.    The Payoff Statement further advised Ms. Baldanzi and Mr. Long that if they did not make the above payments within fifteen days "beyond the current payment due date," a late fee of $30.97 would be imposed.

26.    The Payoff Statement also indicated that funds received after the current due date would be subject to an additional $50.92 per day.

27.    The Bank charged Ms. Baldanzi and Mr. Long interest until Monday, October 2, 2006, four (4) days after Ms. Baldanzi and Mr. Long closed their co-op loan on September 28, 2007 (a Thursday).

28.    The Bank failed to calculate correct interest and charged Plaintiffs extra-contractual interest four (4) days beyond the date the loan was paid off at the closing. Acting under compulsion, Ms. Baldanzi and Mr. Long paid approximately $200 to cover these extra-contractual interest charges.

29.    Upon information and belief, it is the Bank's standard practice not to deliver the co-op shares and proprietary lease to the Borrower at closing unless the Borrower pays the total amount of extra interest demanded in the Payoff Statement. Accordingly, Plaintiffs Baldanzi and Long had no alternative but to pay the full amount of extra interest Defendant Wells Fargo demanded in order to pay off their co-op loan. Unless they paid the extra interest, they could not close and would have been unable to sell and deliver their co-op shares as required by their contractual obligations to the buyer of their co-op.

### C.    Wells Fargo's Wrongful Extra-Contractual Interest Charges to its Co-Op Borrowers

30.    Defendant Wells Fargo's wrongful conduct to the class of co-op borrowers (Borrowers) arises out of the following scenario.  Wells Fargo agrees to

7

issue a co-op loan for the purchase or refinance of a cooperative apartment. At that time, the Borrower enters an agreement with Defendant whereby Defendant agrees to lend money to the Borrower in consideration for repayment of the principal with interest (the "Note" or "Loan Contract"). Pursuant to this Note and accompanying Security Agreement, the Borrower also agrees to pledge his shares of stock ("Stock") in the cooperative Corporation ("Co-op" or "Property"), and to assign the proprietary lease issued to the borrower by the Co-op to occupy the cooperative apartment ("Proprietary Lease" or "Lease") to the Bank.

31.    If the Borrower later decides to sell or refinance his/her apartment, the Borrower so notifies Wells Fargo before the closing. Prior to the termination of the Borrower's co-op loan with Wells Fargo, the Bank issues a "Payoff Statement" indicating the amount that the Borrower must pay before the Bank will release the Stock and Proprietary Lease to the Borrower's property.

32.    In computing the amount owed by the Borrower, Wells Fargo flouts the plain terms of its Loan Contract and charges the Borrower additional interest not permitted by that Loan Contract. Wells Fargo fails to calculate the amount of principal and interest remaining on the Borrower's loan as of the time the loan ends. Instead, Defendant adds one or more days of *additional interest* beyond the closing date – even though the Borrower will already have paid off in full the balance owed to the Bank.

33.    If the closing is on a Monday through Wednesday, the Bank typically charges interest until the day *after* the closing. If the closing is on a Thursday or Friday, the Bank typically charges three to four extra days of interest until the following Monday. If Monday is a "holiday" the Bank will tack on still another day. In short,

8

Defendant Wells Fargo charges the Borrower interest which is greater than the amount its own Loan Contract permits.

34.    Only if the Borrower delivers to the Bank a cashier's or bank check, certified funds or a wire transfer for the outstanding balance of his loan – *plus the additional deceptive interest charges* assessed by Wells Fargo – will the Bank relinquish its interest in the property at the closing by delivering to the Borrower the Stock Certificate and the Proprietary Lease for the Co-op.

## CLASS ACTION ALLEGATIONS

35.    This action is brought on behalf of Plaintiffs in their individual capacity, and as a class action on behalf of all co-op borrowers in the State of New York and nationwide (the "Class" or "Class Members"), whom Defendant Wells Fargo has overcharged by imposing extra-contractual interest charges in connection with the payoff or refinancing of their co-op loans. The Class begins six years prior to the commencement of the action, and includes all persons upon whom Defendant continues in the future to assess such wrongful and excessive interest charges.

36.    Defendant has engaged in an ongoing unlawful practice of imposing extra interest charges on Borrowers even after they terminate their co-op loans, in violation of: (a) Wells Fargo's Loan Contracts with the Borrowers, (b) the common law of the relevant states, and (c) the New York General Business Law and the comparable consumer protection statutes of the other states where Defendant has co-op loans. This practice is to the detriment – monetary and otherwise – of Plaintiffs and the Class.

37.    Defendant Wells Fargo uniformly breached its Loan Contract with co-op Borrowers by charging extra interest not permitted under the terms of the Note beyond

the date the co-op loan was paid off. The Bank typically charges one extra day of interest for co-op closings held Monday-Wednesday and three or four extra days of interest for closings held on Thursday or Friday.

38.     Plaintiffs and the Class were further wrongfully induced and deceived into paying these illegal interest charges based upon Defendant's misleading Loan Agreements, which concealed that Plaintiffs and the Class would be forced to pay such excessive interest charges in order to recoup their Stock and Proprietary Lease from Wells Fargo, which was necessary in order for them to be able to sell their properties.

39.     Defendant's Loan Agreements, which set forth the terms of the co-op loans, separately and/or in combination:

      (a)     MISREPRESENTED that that the Borrower would only be required to pay the actual principal and accrued interest on their co-op loans up until the date he or she terminated the loan; and

      (b)     OMITTED to inform the Borrower that he or she would be required to pay additional interest on his co-op loan beyond the termination date in order to recover the Stock and Proprietary Lease on his or her Co-op.

40.     This action is properly brought as a class action pursuant to Fed. R. Civ. P. 23 for the following reasons:

      (a)     The Class consists of thousands of persons, and is so numerous that joinder of all Class Members, whether otherwise required or permitted, is impracticable;

      (b)     There exist questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members, including:

            1) whether Defendant Wells Fargo breached its Loan Contracts with each Borrower stating that he or she would only be required to pay the actual amount of principal and the actual interest accrued on the loan until termination of the loan in order to recover his or her stock and Proprietary Lease,

10

2) whether Defendant Wells Fargo misrepresented that the Borrower would only be required to pay the actual amount of principal and the actual interest accrued on his loan in order to recover his stock and Proprietary Lease upon termination of his loan,

3) whether Defendant was unjustly enriched by imposing the excess interest charges upon Plaintiffs and the Class of Borrowers,

4) whether Defendant should be enjoined from continuing its unlawful practices, and

5) whether Defendant is liable to the Class and the measure of damages, restitution or other relief;

(c)     Plaintiffs' claims are typical of the claims of the Class. Like all Class members, Named Plaintiffs Baldanzi and Long were injured by Wells Fargo's imposition of excessive interest charges when they attempted to pay off their co-op loan. Named Plaintiffs Baldanzi and Long have suffered the same kind of harm as other Class members, and have no conflicts with other Class members.

41.    Plaintiffs have hired counsel who are able and experienced in class action litigation, and who will fairly and adequately protect the interests of the Class.

42.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Individual damages to any one Class member may be relatively small, making the expense of individual litigation prohibitive or impractical for Class members.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

43.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this complaint and incorporate such paragraphs by reference.

44.    Defendant Wells Fargo has charged interest not permitted by its Loan Agreements with Plaintiffs and the Class.

11

45.    Defendant's actions in charging and collecting such interest constitute a breach of Defendant's Loan Agreements with Plaintiffs and the Class.

46.    As a result of Defendant's conduct in billing and/or collecting contractually impermissible interest charges from Plaintiffs and the Class members, Plaintiffs and other members of the Class have suffered injury and are entitled to recover monetary damages.

### AS FOR A SECOND CAUSE OF ACTION
### (Violation of N.Y Gen. Bus. Law § 349 and Comparable Consumer Protection Statutes of other States where Defendant Has Co-op Loans)

47.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this complaint and incorporate such paragraphs by reference.

48.    The Loan Agreements between Defendant and Plaintiffs and the Class members described herein are consumer transactions within the meaning of N.Y. Gen. Bus. Law § 349 and the comparable consumer protection statutes of the other states where Defendant has co-op loans.

49.    Defendant Wells Fargo engaged in materially "deceptive acts and practices" within the definition of N.Y. Gen Bus Law § 349(a) and also has violated the comparable consumer protection statutes of the other states where Defendant has co-op loans by misrepresenting the amount of interest that New York State Borrowers would be charged, by failing to advise the Borrowers in advance that they would be forced to pay an extra interest charge, and by wrongfully extracting such excessive interest at closing. Such practices were aimed at consumers and the public.

50.    Defendant's failure to disclose that its Borrowers would be charged extra interest has a broad impact on consumers at large because it is representative of the way Defendant does business with all its co-op customers.

51.    Defendant's failure to disclose that Borrowers would be charged extra interest was likely to mislead a reasonable consumer in the same situation as Plaintiffs and the Class.

52.    As a result of Defendant's unlawful, deceptive, and unfair trade practices, Plaintiffs and the other Class Members have suffered injury and damages in that they have been forced to pay illegal interest charges beyond those provided for in their Agreements with Wells Fargo or forgo their ability to sell their homes, or close their loans.

53.    Pursuant to the New York General Business Law and the comparable consumer protection statutes of the other states where Defendant has co-op loans, this Court has the power to enjoin the continuation of Defendant's illegitimate, deceptive, and unfair trade practices and scheme. Unless enjoined by this Court, Wells Fargo will continue imposing illegal interest charges upon all of its co-op loan customers.

## AS FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment)

54.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs of this complaint and incorporate such paragraphs by reference.

55.    Because of the wrongful activities described above, including the collection and retention of extra-contractual interest rightfully belonging to Plaintiffs and the Class, Defendant has earned illegal profits and unjustly enriched itself at the expense of the Plaintiffs and all Class Members.

13

56.    As a result of Defendant's retention of interest properly belonging to the Class, Defendant must account to the Plaintiffs and the Class for such unjust enrichment and disgorge its unlawfully held monies and profits.

57.    By reason of the foregoing, Plaintiffs and the Class have suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Kathleen Baldanzi and Gerald P. Long and the Class pray for judgment:

(1) Certifying this action as a class action with Plaintiffs certified as Class representatives;

(2) Awarding compensatory damages, restitution and/or other amounts to Plaintiffs and the Class;

(3) Enjoining Defendant Wells Fargo from continuing to implement its unlawful and illegal practices;

(4) Awarding Plaintiffs and the Class all costs and disbursements, including attorneys' fees, experts' fees, and other class action-related expenses;

(5) Awarding pre-judgment and post-judgment interest to Plaintiffs and the Class on their damages; and

(6) Granting such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues and claims so triable.

14

Dated: New York, New York
      October 23, 2007

SANFORD WITTELS & HEISLER, LLP

By:_____

     Steven L. Wittels (SW-8110)
     William R. Weinstein (WW-4289)
     Jeremy Heisler (JH-0145)
950 Third Avenue, 10th Floor
New York, New York  10022
(646) 723-2947
Email: swittels@nydclaw.com;
        wweinstein@nydclaw.com;
        jheisler@nydclaw.com

*Attorneys for Plaintiffs Kathleen Baldanzi and Gerald P. Long and the Class*

# Exhibit B

# CONGRESSIONAL REVIEW
# OF OCC PREEMPTION

## HEARING

BEFORE THE

### SUBCOMMITTEE ON
### OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

### ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

JANUARY 28, 2004

Printed for the use of the Committee on Financial Services

## Serial No. 108–65



U.S. GOVERNMENT PRINTING OFFICE

95–717 PDF          WASHINGTON : 2004

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## HOUSE COMMITTEE ON FINANCIAL SERVICES

MICHAEL G. OXLEY, Ohio, *Chairman*

JAMES A. LEACH, Iowa
DOUG BEREUTER, Nebraska
RICHARD H. BAKER, Louisiana
SPENCER BACHUS, Alabama
MICHAEL N. CASTLE, Delaware
PETER T. KING, New York
EDWARD R. ROYCE, California
FRANK D. LUCAS, Oklahoma
ROBERT W. NEY, Ohio
SUE W. KELLY, New York, *Vice Chair*
RON PAUL, Texas
PAUL E. GILLMOR, Ohio
JIM RYUN, Kansas
STEVEN C. LATOURETTE, Ohio
DONALD A. MANZULLO, Illinois
WALTER B. JONES, JR., North Carolina
DOUG OSE, California
JUDY BIGGERT, Illinois
MARK GREEN, Wisconsin
PATRICK J. TOOMEY, Pennsylvania
CHRISTOPHER SHAYS, Connecticut
JOHN B. SHADEGG, Arizona
VITO FOSSELLA, New York
GARY G. MILLER, California
MELISSA A. HART, Pennsylvania
SHELLEY MOORE CAPITO, West Virginia
PATRICK J. TIBERI, Ohio
MARK R. KENNEDY, Minnesota
TOM FEENEY, Florida
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
TIM MURPHY, Pennsylvania
GINNY BROWN-WAITE, Florida
J. GRESHAM BARRETT, South Carolina
KATHERINE HARRIS, Florida
RICK RENZI, Arizona

BARNEY FRANK, Massachusetts
PAUL E. KANJORSKI, Pennsylvania
MAXINE WATERS, California
CAROLYN B. MALONEY, New York
LUIS V. GUTIERREZ, Illinois
NYDIA M. VELAZQUEZ, New York
MELVIN L. WATT, North Carolina
GARY L. ACKERMAN, New York
DARLENE HOOLEY, Oregon
JULIA CARSON, Indiana
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
BARBARA LEE, California
JAY INSLEE, Washington
DENNIS MOORE, Kansas
MICHAEL E. CAPUANO, Massachusetts
HAROLD E. FORD, JR., Tennessee
RUBÉN HINOJOSA, Texas
KEN LUCAS, Kentucky
JOSEPH CROWLEY, New York
WM. LACY CLAY, Missouri
STEVE ISRAEL, New York
MIKE ROSS, Arkansas
CAROLYN McCARTHY, New York
JOE BACA, California
JIM MATHESON, Utah
STEPHEN F. LYNCH, Massachusetts
ARTUR DAVIS, Alabama
RAHM EMANUEL, Illinois
BRAD MILLER, North Carolina
DAVID SCOTT, Georgia
CHRIS BELL, Texas

BERNARD SANDERS, Vermont

Robert U. Foster, III, *Staff Director*

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

SUE W. KELLY, New York, *Chair*

RON PAUL, Texas, *Vice Chairman*
STEVEN C. LaTOURETTE, Ohio
MARK GREEN, Wisconsin
JOHN B. SHADEGG, Arizona
VITO FOSSELLA, New York
JEB HENSARLING, Texas
SCOTT GARRETT, New Jersey
TIM MURPHY, Pennsylvania
GINNY BROWN-WAITE, Florida
J. GRESHAM BARRETT, South Carolina

LUIS V. GUTIERREZ, Illinois
JAY INSLEE, Washington
DENNIS MOORE, Kansas
JOSEPH CROWLEY, New York
CAROLYN B. MALONEY, New York
JIM MATHESON, Utah
STEPHEN F. LYNCH, Massachusetts
ARTUR DAVIS, Alabama

# CONTENTS

| | Page |
|---|---|
| Hearing held on: | |
| January 28, 2004 | 1 |
| Appendix: | |
| January 28, 2004 | 51 |

## WITNESSES

### WEDNESDAY, JANUARY 28, 2004

| | |
|---|---|
| Belew, Joe, President, Consumer Bankers Association | 42 |
| Hammond, W. Lee, Board Member, AARP | 48 |
| Miller, Hon. Thomas J., Attorney General, State of Iowa, on behalf of the National Association of Attorneys General | 15 |
| Shelton, Hilary O., Director, Washington Bureau of the National Association for the Advancement of Colored People | 46 |
| Taylor, Diana L., New York Superintendent of Banks, on behalf of the Conference of State Bank Supervisors | 17 |
| Taylor, John, President and CEO, National Community Reinvestment Coalition | 37 |
| Thomas, Karen M., Director of Regulatory Affairs, Independent Community Bankers of America | 40 |
| Williams, Hon. Julie L., First Senior Deputy Comptroller and Chief Counsel, Office of the Comptroller of the Currency | 13 |
| Yingling, Edward L., Executive Vice President, American Bankers Association | 36 |

## APPENDIX

| | |
|---|---|
| Prepared statements: | |
| Kelly, Hon. Sue W. | 52 |
| Oxley, Hon. Michael G. | 54 |
| LaTourette, Hon. Steven C. | 56 |
| Belew, Joe | 69 |
| Hammond, W. Lee | 78 |
| Miller, Hon. Thomas J. | 86 |
| Shelton, Hilary O. (with attachments) | 106 |
| Taylor, Diana L. | 145 |
| Taylor, John | 167 |
| Thomas, Karen M. | 181 |
| Williams, Hon. Julie L. | 196 |
| Yingling, Edward L. | 214 |

## ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | |
|---|---|
| Gutierrez, Hon. Luis V.: | |
| Transcript of voice mail message received by Assistant Attorney General Mark Fleischer, January 7, 2008 | 232 |
| Kelly, Hon. Sue and Gutierrez, Hon. Luis V.: | |
| Letter to GAO, April 1, 2004 | 233 |
| Letter to OCC, February 27, 2004, with their response | 236 |
| Kelly, Hon. Sue W.: | |
| Letters from various Members to Hon. John D. Hawke, Jr. | 274 |
| Taylor, John: | |
| NCRC Report, "The Broken Credit System" | 290 |
| NCRC statement to OCC, September 25, 2008 | 347 |

(V)

13

panel today, I am pleased to have with us three excellent wit-
nesses. First is the Honorable Julie L. Williams. She is First Senior
Deputy Comptroller and Chief Counsel representing the Office of
the Comptroller of the Currency. Also with us is the Honorable
Thomas J. Miller, Attorney General, State of Iowa, testifying on be-
half of the National Association of Attorneys General. I discussed
this issue with Attorney General Miller at another hearing last No-
vember. It is good to see you again today, Attorney General, and
we do thank you for coming back.

And finally, I am honored to have the opportunity to introduce
Ms. Diana L. Taylor. She is the New York Superintendent of Bank-
ing. She will be testifying on behalf of the Conference of State
Bank Supervisors. There are many important issues that we are
going to discuss today, but none more significant than protecting
consumers, something Ms. Taylor takes very seriously as the head
of the New York banking department.

I thank you all for your appearance today. I know that it was not
easy to travel and plan to be here, so I appreciate your spending
time with us this morning. Thank you very much. Without objec-
tion, your written statements will be made part of the record and
you will be each recognized for 5 minutes. If you have not testified
before, the box on the table in front of you has three lights. Red
means stop. Yellow means you have 1 minute. Green, of course,
means go.

So we are going to start with you. You may go first, Ms. Wil-
liams.

## STATEMENT OF HON. JULIE L. WILLIAMS, FIRST SENIOR DEP-
UTY COMPTROLLER AND CHIEF COUNSEL, OFFICE OF THE
COMPTROLLER OF THE CURRENCY

Ms. WILLIAMS. Chairwoman Kelly, Ranking Member Gutierrez,
Ranking Member Frank, and Members of the subcommittee, I ap-
preciate the invitation to discuss the OCC's recently issued pre-
emption rules. I will begin by describing what our new rules do and
what they do not do. Then I will explain why we took the actions
we did and why we acted when we did. Then I will address one of
the misperceptions, one of many, unfortunately, that surround the
new rules. There have been some rather extreme characterizations
of these new rules, so let me begin by explaining exactly what they
do.

The first regulation, I will call it the preemption rule, clarifies
the extent to which national banks's lending, deposit-taking and
other Federally authorized activities are subject to State laws. The
rule provides that a State law does not apply to a national bank
if the State law obstructs, impairs or conditions the bank's ability
to exercise the power granted to it under Federal law by Congress,
unless Congress has provided that the State law does apply. This
approach reflects fundamental constitutional supremacy clause doc-
trine. The regulation carefully follows standards established by the
U.S. Supreme Court.

Our rulemaking authority is based on several sources in Federal
law. The types of State laws the rule preempts is substantially
nearer those already preempted by the Office of Thrift Supervision

14

in its preemption regulations for Federally chartered savings associations.

It is also important to recognize what the OCC's preemption regulation does not change. It does not immunize national banks from complying with a host of State laws that form the infrastructure of doing the business of banking; contract law, tort law, public safety laws, generally applicable criminal law. It does not preempt anti-discrimination laws, nor, Mr. Frank's issue, enforcement of those laws. It does not change the allowable rates of interest a national bank may charge on a loan. It does not authorize any new national bank powers or activities, and it makes no changes to our existing rules governing the activities of operating subsidiaries.

Our second new regulation interprets a provision of the National Bank Act that grants the OCC exclusive authority to supervise, examine and regulate national banks. In this, what we call our visitorial powers rule. We clarify that the scope of the OCC's exclusive authority focuses on the content and conduct of the banking business that is authorized to national banks under Federal law. We also interpreted a portion of the statute that refers to powers of courts of justice as not grant to State officials any additional authority beyond what they might otherwise possess to examine, supervise or regulate the banking business of national banks. That is what we did.

The second point I want to address is why we took these actions and why we took them now. We have recently seen an unprecedented number and variety of state and local enactments intended to limit and control the ability of national banks to engage in banking activities that have been authorized for them by Congress. These state and local enactments prevent national banks from operating to the full extent lawful under their Federal charters. They also undermine the vitality of the dual banking system, which is predicated on distinctions between state and Federal bank powers and regulations.

These laws, many with laudable goals, also have real practical daily consequences. They have unsettled mortgage markets, reduced the availability of legitimate subprime loans to some consumers, increased regulatory burden, added operational costs, created unpredictable standards of operation, and uncertain risk exposures. My written statement discusses these issues in more detail.

The OCC's new rules were designed to supply urgently needed clarification of the standards applicable to national banks's activities and to restore predictability to their operations. Our process, and I am sensitive to the Chairwoman's comments here, was neither sudden nor secret. Our rules are based on existing law and we acted as the circumstances became compelling. In developing these rules over a period of many months, now dating back to approaching almost two years, we solicited comments from all concerned parties. We consulted widely with representatives of the financial industry, public interest groups, other regulatory agencies and State officials. From the very beginning of our consideration of these issues, we briefed House and Senate Members and their staffs on both sides of the aisle, and we made ourselves available to answer any and all questions.

33

State of Iowa were to pass an anti-discrimination law tomorrow with respect to lending practices that it would not be preempted?

Mr. MILLER. I think that is correct.

Mr. DAVIS. Do you agree with her characterization that if there were to be some kind of an unfair lending practices act it would also not be preempted?

Mr. MILLER. I think there is a great likelihood that that would be preempted.

Mr. DAVIS. That is would be preempted?

Mr. MILLER. It would be preempted because it would impose conditions on their ability to make loans.

Mr. DAVIS. Okay.

Mr. MILLER. That just fits this broad, broad prohibition; this broad, broad preemption that I just talked about. It is hard to imagine anything in the consumer protection area that would not be preempted by this. That is why this is so revolutionary.

Mr. DAVIS. So Ms. Williams, your argument would be, if I understand it, that there is something unique about discrimination laws? I recognize we are not talking about that in a normal Title VII context, but you are saying there is something unique about the use of the phrase "discrimination" that somehow takes it out of the preemption zone. Is that your position?

Ms. WILLIAMS. Let me explain it in a different way and clarify the point that Attorney General Miller was raising in response to your question and my earlier answer. If you have a State law that says do not engage in unfair and deceptive practices; do not discriminate in your lending practices; of course, we do not argue that it would interfere with a national bank's Federal powers that it has to be allowed to engage in unfair or deceptive practices or discriminatory practices. That type of law protects against practices that are fundamentally inconsistent, abhorrent, to national banks and the way we want to see the national banking system operate.

If you have a State law, and it may be labeled a fair lending law, that says you can only make loans with these terms, not that you cannot make loans that are unfair or deceptive, but you can only make loans with these terms, that kind of law comes in conflict with the authority under Federal law that national banks have to make loans. That lending authority is not subject to that kind of state-imposed condition.

Mr. DAVIS. Let me make this one observation, Ms. Williams, and I suspect the Attorney General might agree with this. I understand as a practical matter how the nomenclature works, but in terms of how policy is made in this area obviously the State's ability to attack all of the problems that make up the whole culture of predatory lending now, it might be, if I have time to finish this observation, it might very well be that that attack is pursued just as aggressively under one type of claim, some kind of a fair lending claim, that does not purport on its face to address discrimination.

It may be the that one could raise some kind of anti-discrimination claim, but I think the Attorney General's concern is that given the relative lack of enforcement power the OCC has, if we truly view this as a national problem, if we think it is affecting the fairness of the market, don't we want to provide at least enough opportunity for the States and for regulators to use whatever tools are

# Exhibit C

# THE WALL STREET JOURNAL.

MONDAY, DECEMBER 31, 2007 · VOL. CCL NO. 153

# Lender Lobbying Blitz Abetted Mortgage Mess

## Ameriquest Pressed For Changes in Laws; A Battle in New Jersey

By GLENN R. SIMPSON

During the housing boom, the subprime industry succeeded at more than just writing mortgages. It also shot down efforts by some states to curtail risky lending to borrowers with spotty credit.

Ameriquest Mortgage Co., until recently one of the nation's largest subprime lenders, was at the center of those battles. Working with a husband-and-wife team of Washington lobbyists, it handed out more than $20 million in political donations and played a big role in persuading legislators in New Jersey and Georgia to relax tough new laws. Those victories, in turn, helped blunt efforts by other states to crack down on reckless lending, critics of the industry contend.

Home loans made by Ameriquest and other subprime lenders are defaulting now in large numbers, roiling global credit markets and sparking debate about whether regulators and lawmakers should have anticipated the mess and taken action. A close look at Ameriquest's lobbying and political donations shows how the subprime industry maneuvered to defeat legislation that might have contained some of the damage.

Executives at Ameriquest, based in Orange, Calif., acknowledge that the company lobbied heavily against state lending restrictions, but say that other subprime lenders did so as well. In fact, a host of subprime lenders and banking trade groups, including Citigroup Inc., Wells Fargo & Co., Countrywide Financial Corp. and the Mortgage Bankers Association, spent heavily on lobbying and political giving.

Ameriquest, a unit of ACC Capital Holdings, has stopped making new subprime loans, and it has sold some
*Please turn to page A10*

### Money Trail

Recipients of money from Ameriquest, company executives, spouses and associates, 2002–06.

| Recipient | Contribution |
|---|---|
| Progress for America Voter Fund | $5,000,000 |
| Arnold Schwarzenegger | 1,456,292 |
| Republican Nat'l Committee | 1,231,000 |
| Democratic Nat'l Committee | 1,051,250 |
| Presidential Inauguration Committee 2005 | 1,000,000 |
| George Bush | 203,500 |
| Democratic Governors Assoc. | 152,000 |
| Democratic Atty. Gen. Assoc. | 55,000 |

Sources: Federal Election Commission; National Institute on Money in Politics; Center for Public Integrity; state disclosure offices

*Continued from Page One*
operations and is winding down others. It is now a defendant in hundreds of lawsuits alleging mortgage fraud.

Data from federal and state campaign-finance records, Internal Revenue Service filings, and the National Institute on Money in State Politics show that from 2002 through 2006, Ameriquest, its executives and their spouses and business associates donated at least $20.5 million to state and federal political groups. In comparison, over the same time period, Countrywide Financial, another large subprime lender, gave about $2 million in campaign gifts, and spent an additional $6.7 million lobbying in Washington, records indicate.

Some of the giving by Ameriquest executives and associates was high-profile. President Bush received more than $200,000 for his 2004 re-election campaign, and Ameriquest founder Roland Arnall and his wife, Dawn, contributed more than $5 million to political organizations that



*Roland Arnall*

backed the president. Last year, President Bush appointed Mr. Arnall ambassador to the Netherlands, and his wife took over as chairman of Ameriquest's parent company. California Gov. Arnold Schwarzenegger's campaigns received at least $1.4 million, along with stacks of tickets to a Rolling Stones concert that were used to lure big donors. A spokesman for Gov. Schwarzenegger said his decisions are not influenced by campaign contributions. Mr. Arnall declined to comment. The White House said Mr. Arnall was nominated because of his qualifications.

Much of Ameriquest's efforts took place below the national radar, at the state level. State legislatures wanted to crack down on so-called predatory lending, which refers to the use of deceptive or unfair practices in the sale of high-interest loans, often to low-income borrowers who can't afford them. In New Jersey, for example, lawmakers passed a strong predatory-lending law in 2003 that made it difficult for Ameriquest to continue doing business there.

Washington lobbyist Wright Andrews and his wife, Lisa, coordinated much of the industry's lobbying. Mr. Andrews's firm, Butera & Andrews, collected at least $4 million in fees from the subprime industry from 2002 through 2006, congressional lobbying reports indicate. Mr. Andrews didn't represent Ameriquest directly. He ran three different subprime-industry trade groups: the National Home Equity Mortgage Association, of which Ameriquest was a member; the Coalition for Fair and Affordable Lending, which spent $6.3 million lobbying against state laws before it dissolved earlier this year, according to federal filings; and the Responsible Mortgage Lending Coalition.

In 2003, Lisa Andrews was appointed senior vice president for government affairs at Ameriquest. Her public-relations firm, Washington

# Lobbying Abetted Mortgage Crisis

Communications Group Inc., claims credit on its Web site for coordinating the industry's victory in New Jersey, as well as its overall strategy at the state level. Ms. Andrews left Ameriquest in 2005 and returned to her firm.

Ameriquest was founded by Mr. Arnall in 1979 as Long Beach Savings & Loan. He later shed all of the thrift's operations except its retail-mortgage unit, which he renamed Ameriquest. During the refinancing boom of the 1990s, Ameriquest became a player in the business of lending to low-income homeowners. The company persuaded many homeowners to take cash out of their houses by refinancing them for larger amounts than their existing mortgages. Many of the new loans carried relatively high interest rates.

## Settling Claims

Last year, ACC Capital, its parent company, agreed to pay $325 million to settle regulators' claims that it charged excessively high mortgage rates and didn't adequately disclose loan risks. Some of the state attorneys general who signed the settlement, including Greg Abbott of Texas, received campaign donations from the firm. Utah's attorney general, Mark Shurtleff, received a $1,000 contribution and Rolling Stones tickets. A spokesman for Mr. Shurtleff says the attorney general was not directly involved in negotiating the settlement. A spokesman for Mr. Abbott notes that the settlement was also negotiated and approved by 48 other state attorneys general.

Ameriquest also handed out Rolling Stones tickets to state legislators in Georgia, Maryland, Nevada, Oregon, Utah, Washington and California, according to ethics records and local news accounts.

Federal lawmakers didn't pose much of a threat to the subprime industry in recent years. Members of Congress received at least $645,000 in donations from Ameriquest and large sums from other big subprime lenders, Federal Election Commission records indicate. They debated new oversight of the industry, but took no action.

The states were a different matter. "What seemed to be developing in the states was that there was going to be a wave of legislation," Mr. Andrews, the lobbyist, said in an interview.

In 2001, Georgia passed the Fair Lending Act. Among other things, it required lenders to be able to prove that a refinancing of any home loan less than five years old would provide a "tangible net benefit" to the borrower. Ameriquest began lobbying the state legislature to remove that provision, arguing the standard was too vague. Other lenders also complained about the law, as did Fannie Mae, the giant buyer of mortgages.

"Ameriquest was very, very engaged," recalls Georgia state Sen. Vincent Fort, who authored the law. Mr.

Fort says that Adam Bass, a lawyer for Ameriquest, lobbied him directly. The state senator says he accused Mr. Bass of victimizing poor minorities, which angered Mr. Bass. A spokesman for Ameriquest, speaking on Mr. Bass's behalf, says the meeting "was a very candid conversation about complex policy issues."

Mr. Andrews, the industry lobbyist, had roots in Georgia. He had attended college and law school there, and in the 1970s, had worked for Sam Nunn, then a U.S. senator from Georgia. Mr. Andrews got involved directly on the subprime matter, lobbying in his capacity as executive director of the Responsible Mortgage Lending Coalition, one of the subprime-mortgage trade groups he ran out of his Washington office. "I wouldn't say it was a huge effort," he says. "We were just part of the overall picture."

Ameriquest began contributing to Georgia politicians. In December 2001, it donated $2,500 to Lt. Gov. Mark Taylor after he emerged as an influential figure in the debate, according to Georgia State Ethics Commission records. It followed up with another $2,500 in September 2002. Mr. Taylor says he remembers Ameriquest as one of the subprime companies that was lobbying, but doesn't recall meeting anyone from the company or getting the contributions.

In October 2002, Ameriquest announced it would stop doing business in the state until the law changed. Shortly thereafter, Standard & Poor's Corp. announced it would no longer assign credit ratings to many mortgage securities containing subprime loans from Georgia. The ratings agency said that under the new law, such loans, if found to be in violation of the law, might carry legal risk, potentially tainting the securities. Without credit ratings, such securities are virtually unmarketable. The change raised the possibility that subprime lenders would simply stop making loans in Georgia.

The subprime industry mounted a campaign against the Fair Lending Act. Within months, the Georgia Senate voted 29-26 in favor of a new law that eliminated for nearly all loans the tangible-net-benefit requirement opposed by the industry. The state House passed the law, 148-25.

Problems were also developing for the industry in New Jersey. The state Assembly there passed a similar law against predatory lending, the Home Ownership Security Act. It too contained a tangible-net-benefit rule, but it didn't provide much guidance on how the standard would be applied. "The New Jersey law makes it impossible for anyone to be in compliance," Mr. Bass, the Ameriquest lawyer, complained at an industry conference.

In October 2002, Ameriquest and Mr. Andrews's lobbying firm contributed $4,500 to five New Jersey state senators, state campaign reports indicate. The American Financial Services Association, a subprime industry group that included Ameriquest, predicted the law would cause lenders to abandon the state. Nevertheless, in the spring of 2003, the bill passed the state Senate and was signed into law.

At that point, opponents of the new law got some help. Just as it had done

## States of Engagement

Ameriquest's contributions to state politicians and groups around the country

| | | | | | |
|---|---|---|---|---|---|
| California | $10.8 million | Georgia | $160,000 | Oregon | $20,500 |
| Texas | 190,000 | New York | 46,000 | Wisconsin | 10,000 |
| Florida | 180,000 | Illinois | 36,820 | Washington | 9,050 |
| New Jersey | 180,000 | Pennsylvania | 30,000 | Utah | 6,000 |

Sources: National Institute on Money in State Politics; state election-disclosure records

in Georgia, Standard & Poor's said it wouldn't rate some securities containing loans from the state. In addition, federal banking regulators issued a series of regulatory orders banning states from applying state consumer-protection rules to federally chartered banks and thrifts, part of a turf battle between federal and state regulators. That put pressure on states to soften predatory-lending rules so federally chartered banks didn't have an advantage over state-chartered ones.

The subprime industry set to work trying to roll back the New Jersey law. The National Home Equity Mortgage Association, one of the subprime groups run by Mr. Andrews, released a survey



## The Subprime Lobby

❖ The Threat: Subprime lenders worried about a wave of restrictive new laws from state legislatures.

❖ The Reaction: In New Jersey and Georgia, lenders lobbied and made political donations, helping to defeat legislation.

❖ The Result: Changes that might have protected homeowners who are now in foreclosure were rolled back.

predicting that the law would reduce mortgages in New Jersey by $4 billion.

Ameriquest and Mr. Andrews's lobbying firm began handing out campaign contributions. Among the recipients were John Adler and Gerald Cardinale, two state senators who had voted for the new law. In October 2003, Mr. Cardinale, a Republican, received a $2,200 donation from Ameriquest, according to state election records. In November 2003, Mr. Adler, a Democrat, received $1,200 from the lobbying firm, the records indicate. In early December, the two senators introduced a bill to make changes sought by the industry.

## 'Remove Barriers'

"I don't remember ever being lobbied by Ameriquest," says Mr. Cardinale. "I do recall that we were trying to make it easier for folks to be able to access funds. And, in general, I feel it is a good thing for us to remove barriers to people being able to buy homes." He says he doesn't remember receiving any contributions from Ameriquest. "You guys think we know all of our contributors, but that's usually on a staff level. I don't frankly know who Ameriquest is."

Mr. Adler says he doesn't recall meeting anyone from Mr. Andrews's lobbying firm.

That December, Neil Cohen, a state assemblyman who had voted for the new law, received a $500 donation from the lobbying firm, state records show. The Assembly's Financial Institutions Committee, which was headed by Mr. Cohen, offered its own legislation to soften the lending law. Mr. Cohen couldn't be reached for comment.

In 2004, as debate over the predatory-lending law dragged on, Ame-

riquest and Mr. Andrews's lobbying firm together donated an additional $3,200 to Mr. Cohen, $1,100 to Mr. Cardinale and $1,300 to Mr. Adler, according to state records. Ameriquest gave $10,000 to the Democratic Party in the Assembly, $10,000 to Democrats in the Senate, and $7,000 to Senate Republicans, the records indicate.

Mr. Andrews's wife, Lisa, then head of government affairs at Ameriquest, was also focused on New Jersey. On the Web site of her Washington public-relations firm, she says that she "built a coalition of mortgage brokers, mortgage bankers, appraisers, title companies, and others involved in home mortgage lending to create a grass-roots lobbying campaign that produced 7,000 emails and faxes to state policymakers in a six-week time frame."

## Rolling Back

In June 2004, New Jersey's Assembly and Senate unanimously passed bills that rolled back parts of the earlier law, including the tangible-net-benefit rule. Mr. Bass, the Ameriquest lawyer, announced that the company would "be offering a full range of loans in New Jersey." Thousands of New Jersey homeowners subsequently refinanced existing mortgages or took out new loans with Ameriquest before the market tanked. Many of those loans are now in foreclosure.

After the victories in New Jersey and Georgia, the subprime industry and its lobbyists used similar tactics to fend off unfavorable laws in other states. Texas, for example, was debating new restrictions on home appraisers, whose overly generous valuations contributed to subprime-lending problems. ACC Capital, Ameriquest's parent company, and its executives gave more than $350,000 to Texas politicians in 2006, including $100,000 to Gov. Rick Perry, according to state records. No new appraisal restrictions were instituted. A spokesman for Gov. Perry says ACC did not ask for the governor to take any action on behalf of the industry.

In the wake of the collapse of the subprime market, Mr. Andrews's subprime lobbying business has withered. The three trade groups he ran are gone, and most of his subprime clients have stopped lobbying.

"I certainly was not aware of the degree to which many in the industry clearly failed to follow proper underwriting standards—the standards which they represented they were following to those of us who were lobbying," Mr. Andrews says.

But he also faults the Federal Reserve for letting the industry get out of control.

"Personally, I think and have long felt the Fed should have done more early on," he says. "But I don't think anybody realized the level of problems that were going to come out in the last year or two. If you had said to me the industry was going to melt down, I would have said you were absolutely insane."